## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  JKB-22-439** |
| | : | |
| **DAVID WARREN** | : | |
| | : | |
| **Defendant.** | : | |

---

### REPLY IN SUPPORT OF MOTION TO SUPPRESS FRUITS OF WARRANTLESS SEARCHES AND SEIZURES

Defendant David Warren ("Mr. Warren"), by and through his counsel, John M. McKenna, Michael E. Lawlor, Adam C. Demetriou, and Brennan, McKenna & Lawlor, Chtd., respectfully submits the following Reply in Support of his Motion to Suppress Fruits of Warrantless Searches and Seizures (ECF No. 134).

### I.   Mr. Warren Has Satisfied his Initial Burden to Demonstrate Standing to Challenge the Searches and Seizures at Issue. The Government Now Bears the Burden to Prove Their Legality.

In its Response, the Government argues that Mr. Warren's Motion is deficient because it does not sufficiently identify the bases for the relief requested. The Government's argument misapprehends the law concerning the controlling burden of proof with respect to warrantless searches and seizures. Warrantless searches and seizures are *per se* unreasonable unless the Government can demonstrate they fall within one of the narrow exceptions to the Fourth Amendment's warrant

1

requirement. *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). It is well established that "[t]he government bears the burden of proof in justifying a warrantless search or seizure." *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013); *see also Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

With respect to a warrantless search or seizure, a defendant bears an initial burden to demonstrate a legitimate expectation of privacy in the areas searched or property seized. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). In other words, a defendant must first prove that he has standing to object to a warrantless search or seizure. Once a defendant has made such a showing, the burden shifts to the Government to justify the presumptively unlawful search or seizure. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (explaining that "the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions") (internal citations omitted); *see also, e.g.*, *United States v. McCormick*, No. 5:23-CR-276-1FL, 2024 U.S. Dist. LEXIS 56311, at *3-4 (E.D.N.C. Feb. 14, 2024) (explaining the burden shifting framework applicable to motions to suppress the fruits of warrantless searches and seizures).

In his Motion, Mr. Warren has identified several presumptively unlawful warrantless searches and seizures of his person and property. The Government has *not disputed* that Mr. Warren has standing to challenge these searches and seizures. Mr. Warren is therefore entitled to an evidentiary hearing at which the Government must prove the legality of the subject searches and seizures. There is simply no requirement under the law that Mr. Warren anticipate all possible arguments the Government could raise to justify these searches and seizures and explain in the first instances why such arguments fail. In its Response, the Government has set forth its theories of legality with respect to the warrantless searches and seizures. Mr. Warren now replies.

## II.   May 31, 2016 Arrest

On May 31, 2016, members of the Baltimore Police Department arrested Mr. Warren without a warrant and in the absence of probable cause. The arrest therefore violated the Fourth Amendment. The fruits of this arrest and all evidence derived therefrom must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963).The May 31, 2016 warrantless arrest and search of David Warren are the subject of Overt Act 11 in the Indictment, which alleges that "on or about May 31, 2016, in the 1200 block of East Lafayette Avenue, WARREN unlawfully possessed two loaded Smith & Wesson .40 caliber handguns[.]" (ECF No. 1 at 11.) With respect to this arrest, Mr. Warren has received the following materials in discovery:

(1) Detective Romeo's two-page report detailing the arrest; (2) a KGA radio recording containing seconds of discussion between officers and dispatch staff, all of which occurred after the arrest: and (3) a 51-second clip[1] of Detective Frank Golimowski's body-worn camera footage depicting Mr. Warren handcuffed and seated on a curb next to another police officer. Mr. Warren has not received any additional body-worn camera footage, surveillance footage, reports, notes, photographs, or other materials related to this arrest. It appears that at the motions hearing, the Government will rely solely on the testimony of various officers to establish the events of May 31, 2016 and justify their legality.

As an initial matter, the introduction at trial of any evidence related to this warrantless arrest would violate Mr. Warren's Fifth Amendment due process rights based on the failure of police to preserve potentially exculpatory evidence as required under the then-existing body-worn camera policy of the Baltimore Police Department. *E.g.*, *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). The Baltimore Police Department first established a body-worn camera pilot program policy on October 26, 2015. *See* Ex. A. That policy commands that: "Unless unsafe, impossible, or impractical to do so, the BWC shall be activated: (1) at the initiation of a call for service or other activity that is investigative or enforcement in nature; (2) during any encounter that becomes confrontational." The policy further notes

---

[1] This clip was disclosed to Mr. Warren on May 31, 2024.

that "if a member is unable to activate the BWC at the initiation of a call for service or other activity that is investigative or enforcement in nature, the member shall activate the BWC at the first reasonable opportunity to do so." The policy also describes the circumstances in which it is permissible to end a recording. For example, under the policy, a recording is not to be ended until the event or encounter has fully concluded or the member wearing the camera leaves the scene and anticipates no further involvement in the event. Detective Golimowski did not comply with the policy.

There is no question that Det. Golimowski was assigned and wearing a body-worn camera on May 31, 2016.[2] Det. Golimowski did not activate his body-worn camera until 10:52 a.m., *after* several critical events had already taken place. Det. Golimowski's footage does not depict Mr. Warren's alleged flight upon seeing the officers approach. The footage does not depict Det. Golimowski's alleged pursuit of Mr. Warren. The footage does not depict Det. Golimowski meeting with Det. Romeo at the location of Mr. Warren's arrest. The footage does not depict Det. Golimowski advising Mr. Warren of his *Miranda* rights, nor does it capture the on-scene statements of Mr. Warren that the Government seeks to introduce at trial. Det. Golimowski activated his body-worn camera only after Mr. Warren had been

---

[2] At this time, Mr. Warren is not aware of whether any other BPD officers who responded to the scene of the warrantless arrest were wearing body-worn cameras. Mr. Warren requests that the Government provide this information.

arrested and while Mr. Warren was seated on a curb next to another officer. After cleaning Mr. Warren's glasses, Det. Golimowski then ended the recording.

Det. Golimowski failed to comply with BPD policy governing the use of body-worn cameras. Had he done so, the Court would have the opportunity to view the footage in determining whether the presumptively unlawful warrantless arrest of Mr. Warren fell within one of the narrow exceptions to the warrant requirement. The Court would also have before it a record of the on-scene statements the Government seeks to introduce against Mr. Warren. Though body-worn cameras were relatively new to BPD at the time of the arrest, the record will demonstrate that Det. Golimowski knew how to operate the technology. Indeed, the 51-second clip shows that he was aware of how to turn on and off the recording device. There is no good faith explanation for his failure to activate the camera earlier. As a result of this failure, the best and most objective evidence of the circumstances warrantless arrest and subsequent statements has not been preserved for Mr. Warren's and the Court's review. Instead, Mr. Warren is left to confront officers' recollections about events that occurred *8 years ago*. On the basis of the failure to preserve this evidence in contradiction of BPD policy and the constitutional guarantee of due process, this Court should exclude any evidence of the May 31, 2016 warrantless arrest

Moreover, it is likely that there is undisclosed exculpatory material related to this arrest. Mr. Warren was charged in the District Court of Maryland for Baltimore

City and later the Circuit Court for Baltimore City with offenses related to the firearms recovered on May 31, 2016. *See State v. Warren*, No. 3B02326691 (Dist. Ct. Md. Baltimore City); *State v. Warren*, No. 116180010 (Cir. Ct. Baltimore City). On September 6, 2016, the state charges brought in the Circuit Court were dismissed. Several weeks earlier, on August 16, 2016, Mr. Warren was charged in this Court by way of Indictment with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). *See United States v. Warren*, No. CCB-16-412. The Indictment in that case alleged the possession of the firearms recovered on May 31, 2016. Mr. Warren never appeared in connection with that Indictment. On September 20, 2017, the Government moved to dismiss the Indictment.[3] Two days later, Judge Blake granted that motion. This procedural posture is highly unusual. According to data complied by the federal judiciary, during the 12-month period ending December 31, 2017, 5,550 defendants faced charges of possession of a firearm by a prohibited person. In that time period, such charges were dismissed as to only 293 defendants. In other words, in only 5.27% of cases were charges dismissed.

The charge in CCB-16-412 was not dismissed after any adversarial proceedings. For example, it is not the case that the Indictment was dismissed upon

---

[3] In the intervening months, Mr. Warren proceeded to a jury trial in the Circuit Court for Baltimore City on charges of attempted murder and other offenses related to the shooting alleged in Overt Act 10 of the Indictment in this case. Mr. Warren was acquitted of all charges.

7

a finding of a violation of the Speedy Trial Act. Nor is it the case that the Government moved to dismiss the Indictment after the grant of a dispositive motion to suppress. Instead, the Motion to Dismiss states that "after a further examination of the evidence, the Government believes that dismissal of the case against the defendant is appropriate." CCB-16-412, ECF No. 4. The basis of the Government's belief that dismissal was warranted constitutes discoverable material under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Mr. Warren requests that the Government produce such material before the motions hearing in this case.

### III.    May 2, 2018 Arrest

With respect to the warrantless arrest of Mr. Warren on May 2, 2018, the Government's Response omits critical information regarding the sequence of events leading to the encounter between Mr. Warren and officers Maggio, Pashkevich, Romeo, and Horne. The Government's Response (ECF No. 205 at 11) indicates that the four officers were conducting "routine patrol" when, at approximately 1:30 p.m., they observed a blue Honda Accord "with a license plate handing from the rear of the vehicle." The Response further states that officers ran the Honda's tag through a computer database and found no results for it. The Government then states that the officers followed the vehicle a short distance, activated their lights and sirens, and conducted a traffic stop. That recitation is inconsistent with Officer Romeo's report of the incident. In his report, Officer Romeo wrote that the officers first observed the

subject vehicle at approximately 1:30 p.m. Officer Romeo did not state in the report where the vehicle was at the time he saw it. Officer Romeo claimed that the Honda's rear tag was "hanging" from the right side. Officer Romeo then wrote that Officer Pashkevich ran the tag and found no results. Officer Romeo next claimed that at 2:10 p.m., *40 minutes after having first observed the vehicle* at some unspecified location, he and the other officers saw the same vehicle driving westbound in the 1200 block of E. Lafayette Street. Only then did Sergeant Maggio, who was operating the police vehicle, follow behind the Honda, activate his sirens, and stop Mr. Warren's vehicle. Body-worn camera footage confirms that the traffic stop occurred around 2:10 p.m.

The "ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "An officer's initial decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). The Government will not be able to meet its burden prove the legality of the May 2, 2018 warrantless arrest of Mr. Warren.

As an initial matter, the Government argues that the four officers were justified in stopping Mr. Warren because they had probable cause to believe that a violation of Md. Code Ann., Transp. § 13-411(c) had occurred. As it existed on May 2, 2018, that stature required as follows: "At all times, each registration plate shall

9

be: (1) Maintained free from foreign materials, including registration plate covers as defined in § 13-411.1 of this subtitle, and in a condition to be clearly legible; and (2) Securely fastened to the vehicle for which it is issued: (i) In a horizontal position; (ii) In a manner that prevents the plate from swinging; and (iii) In a place and position to be clearly visible." § 13-411(c). The body-worn camera footage from the incident is sufficient to dispatch of this argument. The images below are still shots from Officer Pashkevich's body-worn camera footage depicting the condition of the license plate at the beginning and end of the traffic stop.





Contrary to Officer Romeo's report and the Government's recitation, the license plate is affixed to the vehicle in a horizontal position and is *not* hanging from the vehicle. Nor will there be any evidence from which this Court can conclude that at the time officers stopped the vehicle, they had received negative results from a check of the license plate sufficient to support the stop. As will be demonstrated at the motions hearing, throughout the duration of the traffic stop and subsequent arrest, officers repeatedly inquired of one another as to whether the vehicle would be released to a third party on scene. Only towards the end of the stop did officers receive information through an MVA check that the tag was not properly registered. If at the inception of the stop, officers knew that the tags were not registered, the

officers would not have needed to discuss whether to release the car to its owner or her proxy.[4] Without valid tags, the car would have to be towed, as it ultimately was.

Additional circumstances demonstrate that officers did not act reasonably in stopping Mr. Warren. Officers claim to have observed the alleged motor vehicle violations giving rise to the stop a full 40 minutes before actually stopping the Honda. If Officer Romeo's report is to be believed, it would appear that the officers observed the purported violations and did nothing about them. The officers simply allowed the vehicle to continue on its way. The Government bears the burden to establish the reasonableness of waiting 40 minutes to effectuate a warrantless seizure on the basis of observations that at most amount to rank suspicion that *de minimis* traffic violations had occurred.

Other factors surrounding the traffic stop and arrest cast further doubt on the reasonableness of the officers' actions in light of the 40-minute delay between the initial observation of the alleged traffic violations and the warrantless seizure. At the scene of the traffic stop, Sergeant Maggio indicated that he had *just* identified *two* subjects who were wanted for questioning in relation to a homicide. After his arrest, Mr. Warren was transported to the Eastern District station. He was then transported to BPD's homicide unit, where he was interrogated by former BPD Sergeant James

---

[4] Mr. Warren's significant other was the owner of the vehicle.

Lloyd.[5] The subject of the interrogation was the March 16, 2018 murder of Charles Tate which occurred in the 2800 block of Hillen Road. Sergeant Lloyd showed Mr. Warren a number of photos, including photos of Larry Harriston, who was suspected of the murder of Mr. Tate. While Mr. Warren was still in custody, at 4:40 p.m.[6], Detective Adam Storie swore out a Statement of Charges charging Mr. Harriston with the murder of Mr. Tate.[7] Mr. Harriston was arrested that same night. These circumstances show that the seizure of Mr. Warren for purported traffic violations was in fact a pretext to interrogate him about that homicide.

Pretextual traffic stops "are analyzed under an objective test, which asks whether a reasonable officer would have stopped the car for a traffic violation, even if he would not have done so but for his suspicions of other criminal activity." *United States v. Womack*, 546 F. Supp. 3d 494, 498 (S.D.W. Va. 2021) (citing *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)). Here, when officers first observed the purported traffic violations at 1:30 p.m., they *did not* effectuate a traffic stop. Forty minutes later, having merely observed Mr. Warren in the presence of a group that presumably included Mr. Harriston and on the basis of the *same* alleged

---

[5] The Government has represented that it does not intend to introduce at trial any of Mr. Warren's statements to Sergeant Lloyd.

[6] Video footage shows Mr. Warren seated in an interview room at BPD homicide as of 4:39 p.m. on May 2, 2018. Sergeant Lloyd entered the room at 4:49 p.m.

[7] Mr. Warren was not charged in connection with this murder. It is not alleged as an overt act in the Indictment. Mr. Harriston was convicted at a jury trial of the murder of Mr. Tate. *See State v. Harriston*, No. 118144001.

violations of the motor vehicle code, they seized Mr. Warren without a warrant. The seizure of Mr. Warren occurred in violation of the Fourth Amendment. Any evidence derived therefrom must be suppressed.

## IV.    August 16, 2018 Arrest

As an initial matter, on May 16 and May 31, 2024, the Government disclosed additional materials related to this incident. Among the materials disclosed are ATF reports, undercover officer recordings, and several lengthy BPD body-worn camera files. Mr. Warren continues to review these materials and will be ready to confront the Government's evidentiary presentation at the motions hearing in this case. Nonetheless, Mr. Warren wishes to reply to the Government's arguments in support of the legality of this arrest.

On August 16, 2018 at around 2:22 p.m., ATF TFO Christopher Faller attempted to conduct a controlled purchase of narcotics near Hope Street and E. Lafayette Avenue. While seated in his vehicle, he was approached on the driver's side by a group of five men, several of whom had previously sold him narcotics. Mr. Warren was not among the group of men who approached TFO Faller's vehicle to conduct the transaction.



After negotiating a price for the narcotics, TFO Faller handed one of the men $800 in cash.



Without providing the narcotics, the man who received the cash the other members of his group walked and then jogged away from TFO Faller's vehicle. TFO Faller radioed to his team that he had been "ripped the fuck off." He described the individuals who committed the theft as follows: "orange and green pants and the rest of the boys are all running south between the alley towards Lanvale. Bullshit. All of them are involved. Every single one of them. The one guy has on multicolored pants under his shorts. He's got a black t-shirt on. The other two have white t-shirts, one with a white t-shirt and blue pants." TFO Faller continued over the radio: "Again guys, they did not physically do anything but they took all my money. The one main guy has on a black t-shirt, multicolored sweatpants underneath black shorts. The others have white t-shirts on. They all went southbound from Lafayette towards Lanvale." TFO Faller identified the man who stole the money as a "guy with glasses" wearing "multicolored sweatpants."

Immediately after the theft, at 2:26 p.m., ATF surveillance photographers captured the group that had just stolen $800 from TFO Faller. Mr. Warren, again, was not among the group. Nor had the group congregated around the vehicle in which Mr. Warren was seated at the time of his arrest.

16



Members of the ATF surveillance team descended upon the area. They approached the parking lot of the Lanvale Towers apartments towards the alley where TFO Faller indicated the suspects ran. The agents observed a group of 10-12 people. Some members of the group ran northbound through the alley in the direction of North Avenue. One agent pursued those individuals. Agents Byrne, Daly, and Christy stayed in the parking lot and arrested everyone on site at gunpoint. Agents Christy and Daly observed a maroon Toyota Avalon. Several people had been standing outside of the vehicle and appeared to be communicating with someone inside the car. Agents Christy and Daly ordered Mr. Warren out of the car at gunpoint. Mr. Warren was wearing black shorts and no shirt. They directed him at first to lay flat on the ground and then to sit up with his hands on his head. The first BPD officer arrived on scene by 2:33 p.m. As reflected in the following still shot

taken from the body-worn camera footage of one of the first responding BPD officers, Mr. Warren was arrested and seated in the parking lot with his hands on his head.[8]



Another still shot depicts the scene of the arrest:

_____

[8] Mr. Warren is the gentleman seated in between the two vehicles. He is wearing no shirt, black shorts, and shoes with green soles. ATF Agent Daly is pictured monitoring the arrestees while armed with an assault weapon.



At 2:37 p.m., a male agent informed that BPD officer that federal authorities did not believe any of the arrestees were involved in the theft from TFO Faller. At around 2:38 p.m., BPD Officer Pashkevich arrived on scene. At the time he arrived, the arrestees, including Mr. Warren, we still seated in the parking lot.



19

Officer Pashkevich then walked around Maroon Toyota and ordered a "pat down" of all arrestees. BPD Officer Horne proceeded to conduct a *full search* of Mr. Warren's person, inspecting the contents of his pockets as depicted below on the right side of the still shot.[9]



Officer Pashkevich approached ATF Agent Christy, who advised that she was looking for $800. Officer Pashkevich speculated that there was "probably something in that Toyota." At 2:41 p.m., Officer Pashkevich called for a K-9 unit to respond to the scene. By 3:00 p.m., no K-9 unit had arrived. Officer Pashkevich spoke with

_____

[9] Officer Horne did not merely conduct a *Terry* frisk, which is limited to a search for weapons. Indeed, at 2:40 p.m., Officer Horne remarked, while searching Mr. Warren, that his pants were so tight that he didn't believe anything could be hidden within them. Yet Officer Horne continued to rummage through Mr. Warren's pockets, pulling out a cigarette, cash, and other items.

ATF Agent Day-Hill and informed her that he believed the maroon Toyota Avalon matched the description of a vehicle that was wanted in connection with a homicide. Officer Pashkevich told Agent Day-Hill that he had called for a K-9 unit and for Detective Romeo to report to the scene. Agent Day-Hill's reaction shows that she had *no information* that the vehicle matched the description of a vehicle associated with any homicide.[10] Agent Day-Hill asked what the ATF could to do assist BPD. Officer Pashkevich responded: "As long as we can just keep Meshawn here until K-9 hits." Agent Day-Hill interjected, referring to Mr. Warren and the other arrestees: "Why don't we just keep them all here." At 3:09 p.m., a K-9 unit responded to the scene. By that point, Mr. Warren and the other arrestees were moved to a corner of the parking lot.[11]

---

[10] At 3:14 p.m., Agent Daly confirmed for Officer Romeo that the federal authorities were *not* investigating the maroon Toyota.

[11] In the still shot below, Mr. Warren is depicted on the far right. He is not wearing a shirt.



At 3:19 p.m., Mr. Warren placed in a police cruiser to be transported to BPD headquarters, where he was later interrogated about the Toyota Avalon. Officers searched the vehicle and recovered two cell phones and a satchel containing a firearm.

The initial seizure of Mr. Warren constituted an unlawful arrest that was not supported by probable cause. The Government's argument that the seizure was instead a *Terry* stop is not supported by the facts or the law.

Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), an officer may conduct a *brief* investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot. For a *Terry* stop to comport with the requirements of the Fourth Amendment, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The Supreme Court has held that a legitimate

*Terry* stop represents a "far more minimal intrusion" on an individual's liberty than does an arrest. *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). "A *Terry* or investigative stop can cross the line and turn into an arrest under certain circumstances. The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the suspect's freedom of action is curtailed to a degree associated with formal arrest." *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001). "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The Government argues that Agents Daly, Christy, and Byrne had reasonable, articulable suspicion to conduct a *Terry* stop of Mr. Warren because (1) they had a reasonable belief that he was "involved" in the theft of money from TFP Faller and (2) they had reason to believe the vehicle Mr. Warren had been driving on that day was involved in a recent homicide. Both arguments fail. The ATF agents heard TFO Faller's radio dispatch after the theft. TFO Faller provided detailed descriptions of the suspects involved in the theft. The ATF agents knew that the suspects had fled to an alleyway. Agents captured the group in real time on surveillance footage in the

23

immediate aftermath of the theft. The agents had no reasonable basis to order Mr. Warren out of his vehicle. Nonetheless, after ordering Mr. Warren out of the car, the agents immediately saw that Mr. Warren *did not* match the description of any of the men who had participated in the theft. To the extent there could have been some reasonable suspicion justifying a stop of the occupant of the vehicle, that suspicion dissipated upon the observation that Mr. Warren was not one of the men who had stolen from TFO Faller. The Government's second argument is baseless. The body-worn camera footage repeatedly confirms that federal authorities *were not* investigating the maroon Toyota and had no information that it matched the description of a vehicle alleged to have been involved in a recent homicide.

In any event, the circumstances of the initial seizure of Mr. Warren are indicative of an arrest, not an investigative detention. The ATF agents arrested Mr. Warren at gunpoint. According to Agent Christy, the agents pointed rifles at Mr. Warren's face. He was ordered to the ground. The evidence at the motions hearing will demonstrate that the show of force, intrusiveness, and duration attendant to the agents' actions are consistent with a formal arrest. A warrantless arrest is only proper where it is supported by probable cause. *United States v. Jones*, No. CR ELH-22-0371, 2023 WL 4627284, at *8 (D. Md. July 18, 2023) (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). The agents did not have probable cause to arrest Mr. Warren – they knew he did not participate in the theft.

The arrival of Officer Pashkevich on scene does not change this analysis. Officer Pashkevich arrived around 2:38 p.m., at which time Mr. Warren and the entire group in the parking lot had been under arrest for more than 10 minutes. Immediately thereafter, he and Officer Horne conducted a full search of Mr. Warren's person, another hallmark of an arrest. Officer Pashkevich then ordered ATF agents to prolong Mr. Warren's unlawful arrest based upon a mere hunch that there was "something" in the Toyota and in order to secure the presence of a K-9 unit. Shockingly, ATF agents agreed to prolong the arrest of the entire group, despite having knowledge that none of the arrestees were involved in the theft from TFO Faller.

The Government argues that Officer Pashkevich would have had probable cause to search Mr. Warren's vehicle even before the K-9 alerted to it. Not so. At the time, Officer Pashkevich knew that a BPD "Vehicle Wanted" flier had been issued for a "Maroon or Plum Color Toyota Avalon" in relation to a homicide that occurred at 4509 Woodlea Avenue on August 7, 2018. *See* Ex. B. The flier contains a blurry photograph of a vehicle. It does not identify a license plate number or model year. It contains no mention of David Warren. The homicide at issue occurred 9 days before Mr. Warren's arrest. It occurred in an area of Baltimore that was in no way proximate to the scene of the arrest. The Government's reliance *Chambers v. Maroney*, 399 U.S. 42 (1970), is misplaced. There, the Supreme Court upheld the

25

warrantless search of a vehicle under very different circumstances. In *Chambers*, several suspects committed a robbery at a gas station. That same evening, two teenagers who had learned that the gas station had been robbed reported to police that they saw a blue station wagon circling around the gas station and then speeding off immediately before the robbery. Police arrived immediately. *Within an hour*, officers pulled over the station wagon, arrested the men inside, who matched a description of the robbers, and later searched the vehicle. Here, Officer Pashkevich relied upon vehicle wanted flier issued in connection with a homicide that occurred 9 days earlier in an area of Baltimore far from the 1200 block of E. Lafayette. There is no indication in the flier that the vehicle was associated with David Warren or anyone matching his description. Unlike in *Chambers*, there was no fresh pursuit on August 16, 2018. The vehicle wanted poster simply did not provide probable cause to search the Toyota.

The Government also argues that even absent a K-9 alert there was probable cause to search to vehicle for evidence of either drug trafficking or the theft from TFO Faller. Officer Pashkevich's mere observation of a satchel in the vehicle does not provide probable cause to believe evidence of a drug crime will be found in the vehicle. And there was simply no particularized information that evidence of the theft would be found in the car. They ATF agents knew that Mr. Warren had not stolen the money. And, as the body-worn shows, Officer Pashkevich was singularly

focused on his belief that the Toyota was consistent with vehicle described in the alert issued in connection with the homicide.

This Court's Fourth Amendment analysis turns on reasonableness. The seizure of Mr. Warren in this case is simply not indicative of a reasonable, minimally intrusive investigative detention where agents knew that Mr. Warren did not match the description of the suspects who had, without any force or threat of force, stolen cash from an undercover officer. Mr. Warren was arrested in the absence of probable cause. The Court should suppress the fruits of the unlawful search and seizure and any evidence derived therefrom.

## CONCLUSION

For the reasons stated above and those to be presented at the motions hearing, this Court should suppress the fruits of the warrantless searches and seizures of Mr. Warren and all evidence derived therefrom.

Respectfully submitted,

_____/s/_____
John M. McKenna
Michael E. Lawlor
Adam C. Demetriou
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of June, 2024, the foregoing was served on all parties via ECF.

_____/s/_____
John M. McKenna